**WILJ INTERNATIONAL LIMITED, Plaintiff,**

v.

**BIOCHEM IMMONUSYSTEMS, INC., Defendant.**

No. C.A. 95–10745–DPW.

United States District Court, D. Massachusetts.

March 30, 1998.

Joel R. Leeman, Bromberg & Sunstein, Boston, MA, for Plaintiff.

Fred A. Kelly, Jr., Beth O'Neill Maloney, Nicholas G. Papastavros, Peabody & Brown, Boston, MA, for Defendant.

WOODLOCK, District Judge.

The within recommendations are adopted on orders of this court.

*REPORT AND RECOMMENDATION REGARDING (1) PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING AN UNAUTHORIZED DEDUCTION (DOCKET NO. 23); (2) CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT OF THE DEFENDANT BIOCHEM IMMUNOSYSTEMS (U.S.), INC. (DOCKET NO. 33); (3) PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIMS (DOCKET NO. 44); (4) BIOCHEM IMMUNOSYSTEMS (U.S.) INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOCKET NO. 48); AND (5) THE DEFENDANT BIOCHEM IMMUNOSYSTEMS (U.S.), INC.'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNTERCLAIM I (DOCKET NO. 55)*

KAROL, United States Magistrate Judge.

Jan. 8, 1998.

The parties to this lawsuit twice entered into written settlement agreements in an attempt to resolve business disputes that had arisen between them. Now, they are engaged in a fierce battle over the meaning of their settlement agreements. One need not look beyond the title of this report and recommendation to realize that, having twice failed to secure peace through the exchange of tribute, they are now resolved to achieve victory at any cost. To avoid being consumed in the resulting conflagration, I shall focus below only on the issues that are both material to the outcome of the pending motions and as to which there are reasonable grounds for disagreement. The parties should be assured, however, that I have indeed considered all the issues presented in their innumerable motions, memoranda, and exhibits, even though I cannot and do not explicitly address them all.

## I. BACKGROUND

In April 1988, plaintiff Integrated Technologies Limited (then known as Wilj International Limited and referred to herein as "plaintiff" or "ITL") entered into an agreement (the "1988 Agreement") with defendant BioChem ImmunoSystems (U.S.), Inc. or its predecessors in interest (collectively referred to herein as "defendant" or "BioChem") for the design, development, manufacture, and sale by ITL to BioChem of a diagnostic immunoassay instrument known as the SR–1. (1988 Agreement, Ex. 4, Docket No. 47.) Under the 1988 Agreement, BioChem was to pay for the instruments within thirty days after it had received, inspected, and accepted them. The 1988 Agreement was modified by a First Amendatory Agreement in 1990. (First Amendatory Agreement Between Wilj International Limited and Boston Diagnostics Development Corp. Inc. ("First Amendatory Agreement"), Ex. 5, Docket No. 47.) Disputes arose shortly thereafter, and, in March 1991, the parties entered into a third agreement (the "1991 Warranty Settlement"), (1991 Warranty Settlement, Ex. 6, Docket No. 47), pursuant to which ITL agreed to give BioChem a warranty allowance on previous purchases in the amount of £779,964, such allowance to be furnished in the form of a per unit discount of £584 on each future purchase by BioChem of an SR–1 pursuant to the 1988 Agreement. In addition, if that did not deplete the full allowance, ITL would credit against the remaining allowance any royalty payments that would otherwise be owed by BioChem to ITL pursuant to the 1991 Warranty Settlement. The 1991 Warranty Settlement further provided that "[i]n the event ... there remains an outstanding balance by 31 December 1993, [ITL] and [BioChem] will agree [sic] a means to settle this within 120 days." (*Id.*)

In May and June 1992, ITL issued invoices totaling £333,198 for instruments that it had shipped to BioChem in fulfillment of BioChem Purchase Order No. 11726. (Declaration of Carol A. Pattenden in Support of Plaintiff's Motion for Partial Summary Judgment Regarding an Unauthorized Deduction ("Pattenden Decl.") ¶ 3, Docket No. 27; Invoices of May–June 1992 from Wilj to Serono Diagnostics, Ex. 5, Docket No. 28.) In July 1992, BioChem paid ITL £248,097.15 on account of those invoices, leaving a balance of £85,100.85 outstanding (net of a £6 charge

that ITL's bank had taken).[1] In response to ITL's inquiries, BioChem maintained that it was withholding this amount to create a fund that would be available to cover any warranty claims that it might assert in the future (presumably with respect to instruments ordered and shipped after the 1991 Warranty Settlement, which had disposed of warranty claims with respect to earlier deliveries). (*See* Pattenden Decl. ¶ 6, Docket No. 27.) In the fall of 1992, BioChem also apparently purported to terminate the 1988 Agreement based on its dissatisfaction with the quality of the ITL instruments. (Defendant BioChem ImmunoSystems (U.S.), Inc.'s Opposition to the Plaintiff's Motion for Partial Summary Judgment and Memorandum in Support of its Cross Motion for Partial Summary Judgment at 3, Docket No. 35.) Attempts by ITL during the Fall of 1992 to collect the outstanding balance through means other than litigation proved unavailing. ITL therefore brought suit against BioChem in this court (hereinafter the "1992 lawsuit" or "Civil Action No. 92–12748–K"), alleging, *inter alia,* breach by BioChem of its purchase obligation under the 1988 Agreement and of its obligation to pay for the goods that were the subject of Purchase Order No. 11726. (*See* Complaint ¶ 6, Ex. 7, Docket No. 28.) [2]

On May 26, 1993, the parties entered into their fourth agreement, which they called a "Settlement Agreement and Release" (the "Settlement Agreement"). (Settlement Agreement, Ex. 7, Docket No. 47.) The present dispute turns largely on the interpretation and legal effect of the following provisions of the Settlement Agreement:

2. RECITAL

This Agreement is made with reference to the following facts:

. . .

2.4 It is the intention of the Parties hereto to settle and dispose of completely and fully, any and all claims, or disputes here-

tofore arising out of, connected with or incidental to the dealings between [them] prior to the effective date hereof, including any and all claims, demands, causes of action, which were or which could have been asserted in .·. Civil Action [92–12748–K] . . . except as expressly reserved in § 5 of this Agreement.

2.5 It is the intention of the Parties hereto that their future dealings be governed by the terms of this Agreement, the Purchase Orders described in ¶¶ 3.1, 3.2, and 3.4 of this Agreement, the [1991 Warranty Settlement], and the April 11, 1988 Agreement between [the parties], as amended on March 1, 1990 (referred to as the "1988 Agreement, as amended").

3. Agreement

The Parties . . . agree as follows:

[Paragraphs 3.1, 3.2, and 3.4 provide for the issuance by BioChem to ITL, and the acceptance by ITL, of certain purchase orders for the purchase by BioChem of new units, for the refurbishment by ITL of BioChem's old units, and for the purchase by BioChem of certain spare parts, subassemblies, and power supplies, all on the terms and conditions set forth in those paragraphs, including the automatic cancellation of any purchase orders for spare parts, sub-assemblies, and power supplies to the extent such products are not delivered by April 30, 1994.]

3.5 [ITL's] Settlement of Warranty Claims.

[ITL] agrees to settle warranty claims as set forth below:

(a) [ITL] agrees to settle any and all outstanding warranty claims pending for an amount of BPS 15,243.39. . . .

(b) The parties confirm the continued existence of the . . . 1991 Warranty Settlement and the rights and obligations arising therefrom.

---

**1.** Consistent with the parties' combative approach, BioChem refuses to admit (but does not deny) that it withheld the £85,100.85. Undisputed evidence in the summary judgment record leaves no doubt that it did. (Declaration of Hugh F. Edmonds in Support of Plaintiff's Motion for Partial Summary Judgment Regarding an Unauthorized Deduction ("Edmonds Decl.") ¶¶ 5–7,

Docket No. 26; Pattenden Decl. ¶¶ 5–8, Docket No. 27.)

**2.** This court's docket reflects that the case was filed on November 17, 1992, that it was assigned case number C.A. 92–12748–K, and that it was drawn to Judge Keeton.

### 3.6 SET–OFF

The Parties agree that as of April 30, 1994 they will set-off any outstanding amounts between them arising from this Agreement, the Purchase Orders described in ¶¶ 3.1, 3.2 and 3.4 of this Agreement, the [1991] Warranty Settlement and the 1988 Agreement as amended and any resulting balance shall be paid by the Party owing it within thirty (30) days. To implement the set-off procedure, the Parties shall exchange documents by April 1, 1994 to allow them to calculate and mutually agree upon the amount of the set-off figure.

### 4. DISMISSAL

Concurrently with the execution and delivery of this Agreement, the parties agree to execute and file in court the Stipulation of Dismissal with prejudice, (attached hereto ...) of the Civil Action [No. 92–12748–K]....

### 5. RELEASE

...

Except for: claims of breach of this Agreement ...; disputes arising under the Purchase Orders referenced in ¶¶ 3.1, 3.2, and 3.4 of this Agreement; disputes arising under the [1991] Warranty Settlement; and disputes arising under the 1988 Agreement as amended by the First Amendatory Agreement of March 1, 1990 and further modified by this Agreement; [the parties release each other from all claims] arising out of, connected to, or incidental to all prior dealings ... including ... any and all known claims ... which were asserted in the Civil Action [No. 92–12748–K].

(*Id.*)

In accordance with the Settlement Agreement, the parties executed and filed a stipulation of dismissal of Civil Action No. 92–12748–K, with prejudice, on June 16, 1993, (Stipulation of Dismissal, Ex. E, Docket No. 37), and they attempted to resume normal business relations. Whatever degree of normalcy they achieved, however, came to an abrupt end within a year. By letter dated May 9, 1994, (Letter from Alan Cookson to John Curtis dated 5/09/94, Ex. 8, Docket No. 47), BioChem purported to "confirm ... our mutual outstanding obligations as of 30 April 1994, which will form the basis of the set-off figure detailed in Section 3.6 of the [Settlement Agreement]." The letter reflected a balance outstanding in favor of BioChem in the amount of £152,346. ITL shot back a reply dated May 12, 1994, (Letter from John Curtis to Alan Cookson dated 5/12/94, Ex. B, Docket No. 37), in which it refuted in several material respects BioChem's reading of the Settlement Agreement. Predictably, BioChem then took issue with ITL's interpretation, under which BioChem would owe ITL a substantial sum of money. (Letter from Alan Cookson to John Curtis dated 5/18/94, Ex. 9, Docket No. 47.) Approximately one year later, in express reliance on the parties' consent in the Settlement Agreement to personal jurisdiction in Massachusetts, ITL commenced this lawsuit seeking, *inter alia,* damages "in no event less than £399,850.13" for BioChem's purported breach of the Settlement Agreement (Count I), as well as additional, unspecified damages for fraud (Count II) and breach of Mass.Gen.Laws ch. 93A, § 11 (Count III). BioChem filed an Answer and a two-count Counterclaim in which it sought damages, respectively, for ITL's purported breach of the Settlement Agreement and misappropriation of trade secrets.

## II. THE CROSS MOTIONS FOR SUMMARY JUDGMENT

The following motions for summary judgment are pending:

1. *Plaintiff's Motion for Partial Summary Judgment Regarding an Unauthorized Deduction* (Docket No. 23): By this motion, ITL seeks partial summary judgment on its claim that BioChem was not authorized to deduct £85,100.85 from its payment for product shipped in fulfillment of Purchase Order No. 11726.

2. *Cross Motion for Partial Summary Judgment of the Defendant BioChem* (Docket No. 33): This is the mirror image of Docket No. 23, in that BioChem seeks partial summary judgment in its favor on ITL's claim that BioChem is liable to ITL for its "unauthorized deduction" in the amount of £85,100.85.

3. *Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims* (Docket

No. 44): By this motion, ITL seeks summary judgment on BioChem's counterclaim for the balance of the warranty allowance remaining under the 1991 Warranty Settlement (said by BioChem to be £464,604), as well as on two other BioChem counterclaims: for misappropriation of trade secrets and for the payment by ITL of £64,302 for the repurchase of obsolete parts.

4. *BioChem's Motion for Partial Summary Judgment* (Docket No. 48): By this motion, BioChem seeks summary judgment on ITL's claim under Mass.Gen.Laws ch. 93A, on the ground that the conduct complained of by ITL did not occur primarily and substantially in Massachusetts.

5. *BioChem's Cross Motion for Partial Summary Judgment as to Counterclaim I* (Docket No. 55): By this motion, BioChem seeks summary judgment on its claim for the outstanding balance of the warranty allowance initially established under the 1991 Warranty Settlement, said by BioChem to be £464,604.

Although the foregoing motions raise numerous issues, the following question predominates: how do the Settlement Agreement and the dismissal of Civil Action No. 92–12748–K, with prejudice, affect ITL's claim against BioChem for the £85,100.85 BioChem withheld in July 1992 and BioChem's claim against ITL for the balance of the warranty allowance that remains outstanding under the 1991 Warranty Settlement?

## III. *SUMMARY JUDGMENT STANDARD*

The standard for summary judgment is familiar. Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). At the outset, the moving party must aver that there is an absence of evidence to support the non-moving party's position. *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990). To avoid summary judgment, the opposing party must produce affirmative evidence demonstrating a genuine issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct.

2548, 2552, 91 L.Ed.2d 265 (1986); *Mesnick v. General Elec. Co.,* 950 F.2d 816, 825 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). "[T]he nonmovant may not rest upon mere allegations, but must adduce specific provable facts demonstrating that there is a triable issue." *Brennan v. Hendrigan,* 888 F.2d 189, 191 (1st Cir.1989). Nor may the opposing party "derail summary judgment by the primitive expedient of insisting that his opponent's evidence should be disbelieved." *Abbott v. Bragdon,* 107 F.3d 934, 942 (1st Cir.1997). While summary judgment should be used sparingly where motive, intent, or state of mind are at issue, it is nevertheless available where plaintiff "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990). In reviewing the non-movant's case, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party," *Stepanischen v. Merchants Despatch Transp. Corp.,* 722 F.2d 922, 928 (1st Cir.1983); *see Mack v. Great Atlantic & Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989), subject, nevertheless, to the caveat that the court "must disregard improbable or overly attenuated inferences, unsupported conclusions, and rank speculation." *Abbott,* 107 F.3d at 938. Where, as here, the parties have filed cross motions for summary judgment, the two motions must be considered independently, with all inferences drawn in favor of plaintiff with respect to defendant's motions and in favor of defendant with respect to plaintiff's motions.

## IV. *ANALYSIS*

### A. *Plaintiff's Motion for Summary Judgment Regarding an Unauthorized Deduction*

There are two analytical components to the question whether BioChem remains liable to ITL for the £85,100.85 which it withheld from its July 1992 payment. First, there is the question whether ITL's claim survived the execution of the Settlement Agreement. This is a conventional issue of contract con-

struction. If the language of the Settlement Agreement unambiguously expresses an intent to preserve ITL's claim for the £85,-100.85 deduction, then, as a matter of law, this claim survived the Settlement Agreement. Conversely, if it is clear from the language of the Settlement Agreement that the parties did not intend to preserve such claim, then, as a matter of law, it did not survive. Finally, if the language of the Settlement Agreement is ambiguous, then the issue of whether the claim survived presents a question of fact for the jury, unless the extrinsic evidence in the summary judgment record regarding intent is so one-sided that a reasonable jury could come out only one way. *See Den Norske Bank A.S. v. First National Bank of Boston, et al.,* 75 F.3d 49, 53 (1st Cir.1996) (stating that a dispute between parties over the meaning of an ambiguous contract is normally an issue for the factfinder "unless the extrinsic evidence presented about the parties intended meaning is so one-sided that no reasonable person could decide to the contrary"), *quoting Allen v. Adage, Inc.,* 967 F.2d 695, 698 (1st Cir.1992). For reasons discussed below, the language of the Settlement Agreement is ambiguous and the extrinsic evidence is not so one-sided that a jury could come out only one way on the issue of the parties' intent. Therefore, neither party is entitled to summary judgment based solely upon an analysis of the parties' intent.

The second component of the analysis involves the question of whether, regardless of the parties' intent, ITL's claim for £85,100.85 was extinguished as a consequence of the dismissal, with prejudice, of the 1992 lawsuit. In other words, it is conceivable that, as a result of the operation of the doctrine of claim preclusion, formerly known as res judicata, ITL's claim was extinguished by the dismissal with prejudice of the 1992 case, even if both parties fully intended to preserve it. One concerned only about the fairness of the result in a particular case might understandably protest that the shared expectations of both parties to an agreement should always control. This view overlooks, however, countervailing institutional interests that underlie the doctrine of claim preclusion. That doctrine is concerned not just with fairness to parties in a particular case, but also with judicial economy and the finality of judgment, all of which are vitally important to the existence, efficiency, and reliability of any public system of dispute resolution. *See, e.g., Kale v. Combined Ins. Co. of America,* 924 F.2d 1161, 1168 (1st Cir.) (stating that "[a]ny idiosyncratic unfairness that may result from the consistent and straightforward application of preclusion principles is, we think, far outweighed by the systemic benefits which flow from steadfast adherence to so salutary a doctrine"), *cert. denied* 502 U.S. 816, 112 S.Ct. 69, 116 L.Ed.2d 44 (1991); *Rose v. Town of Harwich,* 778 F.2d 77, 82 (1st Cir.1985) (stating that "if courts relaxed the principles of claim preclusion every time it appeared that a litigant had a strong claim 'on the equities,' the doctrine would fail to serve its purposes of promoting judicial economy and repose," notwithstanding that "in some individual instances a fairer result might be achieved"), *cert. denied* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986). This is not to say that these institutional concerns always override the equities of a particular case, or vice versa. It is only to say that a sensible balance must be struck between the two.

The Federal Rules of Civil Procedure speak directly to this issue. Specifically, Fed. R.Civ.P. 60(b)(1) gives a court discretion, in the interest of justice, to relieve a party from the consequences of its own "mistake, inadvertence, surprise, or excusable neglect." This may give a court authority in an appropriate case to resurrect a claim that was voluntarily dismissed with prejudice, where it was clear from the language of a settlement agreement that the parties intended to settle only a portion of their dispute. *But cf. Nemaizer v. Baker,* 793 F.2d 58, 62–63 (2d Cir.1986) (holding that although party did not intend to foreclose bringing ERISA claim in the future by entering into stipulation of dismissal of action with prejudice, Rule 60(b)(1) does not provide relief where party's counsel, in hindsight, is dissatisfied with the decision to dismiss and/or breadth of stipulation to dismiss); *Tingley Systems, Inc. v. CSC Consulting, Inc.,* 919 F.Supp. 48, 55 (D.Mass.1996) (stating that "[w]here a

party takes a voluntary action that compromises or extinguishes a claim, that party may not have relief from judgment under Rule 60(b)(1) merely because the party—as here—misapprehends the consequences of the action taken."). Even if such discretion exists, however, it is limited, and one limitation, in particular, has potentially dispositive significance here. Motions under Fed.R.Civ.P. 60(b)(1) must be made "within a reasonable time" or within "one year after the judgment ... was entered," whichever is shorter. Far more than a year has passed since the 1993 dismissal "with prejudice" of the 1992 case, and ITL has not, to this day, filed a motion for relief from whatever preclusive effect such judgment would otherwise have. Therefore, if, as a matter of law, the doctrine of claim preclusion would otherwise apply to such dismissal, the fact that it occurred as a result of "mistake, inadvertence, ... or [even] excusable neglect" would not alone prevent it from having preclusive effect with respect to the claim ITL now seeks to assert. For reasons that will be explained below, however, the question of whether the doctrine of claim preclusion would otherwise apply cannot be determined at the summary judgment stage. Rather, like the question of the parties' intent, it ultimately turns on the construction of an ambiguous provision of the Settlement Agreement.

Returning then to the initial issue of the parties' intent, the first question is whether the language of the Settlement Agreement clearly and unambiguously evidences an intent either to preserve or to extinguish ITL's claim for £85,100.85. ITL argues that such language supports its position, through its express reservation of rights and obligations under the 1988 Agreement, as first amended in 1990 and amended again by the Settlement Agreement. According to ITL, the £85,100.85 is and always was owed under that 1988 Agreement and, therefore, the Settlement Agreement did not extinguish Bio-Chem's obligation to pay this amount. Bio-Chem, on the other hand, argues that the Settlement Agreement, by its terms, settles (and therefore releases) "any and all outstanding warranty claims." According to BioChem, this sweeping language unambiguously includes the £85,100.85 now in dispute,

because, as ITL itself contends, BioChem originally withheld this amount in stated anticipation of its need to establish a fund against which it could charge future warranty claims.

The particular language of the Settlement Agreement that the parties cite in support of their respective positions is set forth verbatim in the excerpts quoted above and, in summary, is found in Paragraph 2.4 (stating intention to settle all claims, except those "expressly reserved in § 5 of this Agreement"); Paragraph 2.5 (stating intention that "future" dealings be governed by, *inter alia*, the Settlement Agreement and the 1988 Agreement, as amended); Paragraph 3.5(a) (stating agreement to "settle any and all outstanding warranty claims pending for an amount of BPS 15,243.39"); Paragraph 3.6 (stating that "outstanding amounts" as of April 30, 1994, arising from, *inter alia*, the Settlement Agreement and the 1988 Agreement as amended will be set-off and, within 30 days of such date, paid by the party owing a balance to the other); and Paragraph 5 (constituting mutual release of all claims except, inter alia, claims for breach of the Settlement Agreement and disputes arising under the 1988 Agreement as amended by the First Amendatory Agreement and as further modified by the Settlement Agreement).

Examining each of these provisions more carefully, none is dispositive of the £85,100.85 dispute, either by itself or when read in conjunction with any other provision. Starting with the first referenced provision, Paragraph 2.4 favors BioChem's position, if at all, only to the extent it expresses an intent to "settle and dispose of completely and fully, any and all claims, or disputes heretofore arising" between the parties, including those asserted in the complaint for Civil Action No. 92–12748–K (the gravamen of which, as discussed below, was BioChem's unauthorized withholding of £85,100.85 from its payment). But this language is itself ambiguous, because it does not state what the terms of the settlement and disposition are. More specifically, it is not inconsistent with a settlement that includes a deferred obligation by BioChem to include the withheld portion of money still owed under the

1988 Agreement in the set-off calculation that must be made by April 30, 1994, pursuant to Paragraph 3.6 of the Settlement Agreement. Along the same lines, any assistance that this language might provide to BioChem for purposes of resolving the present dispute is largely nullified by the exception for claims "expressly reserved in § 5 of this Agreement." While BioChem can and does argue that ITL's claim for £85,100.85 was not *expressly* reserved in § 5" (emphasis added) of the Settlement Agreement, it is nevertheless open to argument whether, as stated in Section 5 of the Settlement Agreement, a reservation of "disputes arising under the 1988 Agreement as amended" is sufficiently "express" to preserve such claim. Thus, standing alone, the language of Paragraph 2.4 is ambiguous.

■ The statement in Paragraph 2.5 that the parties intend their "future dealings" to be governed by, *inter alia*, the Settlement Agreement and the 1988 Agreement, as amended, does not resolve the ambiguity. BioChem argues that the clear import of that phrase is that the claims under the 1988 Agreement, as amended, that are preserved are only those that arise following execution of the Settlement Agreement. But the phrase "future dealings" can just as easily be read to refer to the set-off procedure that is to take effect one year after the execution of the Settlement Agreement, and it certainly does not exclude the possibility that the accounts to be set off include the £85,100.85 balance owing on Purchase Order No. 11726, if such balance remains outstanding as of April 30, 1994. Indeed, ITL can argue at least as persuasively that the omission of the word "future" from Paragraph 3.6 and Paragraph 5 is consistent with its position that the Settlement Agreement evinces an intent to preserve and ultimately dispose of such claim by the end of May 1994.

■ Continuing the review of the provisions on which the parties rely, Paragraph 3.5 is critical to BioChem's position. That provision states, in pertinent part, that ITL "agrees to settle any and all outstanding warranty claims pending for an amount of BPS 15,243.39." It is self-evident to BioChem that the present dispute involves a "warranty claim," because BioChem's stated justification for withholding partial payment in the first place was to establish a reserve against which it could charge future warranty claims, and that such claim was "outstanding" as of the date of execution of the Settlement Agreement. Under this logic, ITL's claim for the £85,100.85 was settled and, therefore, released, by virtue of Paragraph 3.5(a).

BioChem's reasoning is flawed, however, because it is not clear that the present dispute concerns a "warranty claim" at all or, to the extent the present claim involves anything more than the £15,243 that ITL agreed to pay, that it was still "outstanding" as of the date the Settlement Agreement was executed. According to a Declaration filed by Hugh F. Edmonds (Edmonds, Decl., Docket No. 26), who was ITL's Finance Director at the relevant time and a participant in the meetings that are the subject of the Declaration, the parties met in February 1993 and again in March 1993 to discuss BioChem's partial withholding of payment in July 1992. At the February meeting, BioChem's representatives indicated that they believed BioChem had as much as £100,000 of warranty claims outstanding, notwithstanding that, according to ITL's records, BioChem had asserted claims totaling only £4,000. At a follow-up meeting in March, after BioChem had a chance to investigate further the amount of claims that were actually outstanding, its representatives purportedly conceded that the amount of such claims was, indeed, only approximately £15,000. The precise amount that ITL later agreed to pay to settle such claims, as set forth in the Settlement Agreement approximately one month later, was £15,243.39.[3] The difference between the

---

3. Edmonds further states in his declaration that he is "aware that, in subsequent negotiations, the parties agreed that the precise figure was £15,-243, an amount which [ITL] agreed to pay pursuant to § 3.5(a) of the parties' Settlement Agreement." (Edmonds Decl. ¶ 7, Docket No. 26.)

Since Edmonds neither claims that he was present when the "subsequent negotiations" took place nor provides a non-hearsay foundation for his awareness, this latter statement is probably inadmissible hearsay and, to that extent, should not be and has not been considered. *See* Fed.

amount of the claim, as estimated by Bio-Chem's representatives at the March 1993 meeting, and the amount that ITL ultimately agreed to pay is so small that it strongly suggests that the parties intended that ITL would pay in full all the warranty claims that BioChem had actually asserted. This in turn suggests that the parties understood the phrase "outstanding warranty claims" to refer not to the £85,100.85 that BioChem had originally withheld, but only to the £15,243.39 which, according to the parties' reconciled accounts, was the actual aggregate amount of claims then pending. On this quite plausible view, there were no "warranty claims" in excess of £15,243.39 "outstanding" as of the date of the May 1993 settlement; indeed, it can persuasively be argued that BioChem's "warranty claims" never exceeded £15,243, since anything above that was not a "warranty claim" at all, but the assertion of a separate contractual right to establish a reserve against which BioChem might charge future warranty claims.[4]

■ The next relevant provision is Paragraph 3.6, which states that, as of April 30, 1994, the parties "will set-off any outstanding amounts between them arising from [the Settlement] Agreement, ... the [1991] Warranty Settlement and the 1988 Agreement as amended," and the party owing a balance will pay it to the other within thirty days. ITL, of course, reads the phrase "outstanding amounts" to include the £85,100.85, which, after all, arises from the 1988 Agreement as amended. BioChem just as predictably reads the same phrase to include only the amounts not settled pursuant to Paragraph 3.5(a), which, as noted, is itself ambiguous. Because the phrase "outstanding amounts" can plausibly be read either way, Paragraph 3.6 is ambiguous.

■ The final relevant provision of the Settlement Agreement is Paragraph 5, the Release clause. It provides, in language that is equally susceptible to interpretation in favor of either party, that all the parties' claims against each other are released, "[e]xcept for: claims of breach of this Agreement ... and disputes arising under the 1988 Agreement as amended by the First Amendatory Agreement of March 1, 1990 and further modified by this Agreement." If ITL's plausible interpretation of Paragraph 3.6 is adopted, then a failure by BioChem to include the £85,100.85 in the set-off calculation to be made on April 30, 1994 would be a "breach of this Agreement" and thus not released under Paragraph 5. Further, ITL can and does plausibly argue that BioChem's refusal to pay the £85,100.85 presents a dispute "arising under the 1988 Agreement as amended by the First Amendatory Agreement of March 1, 1990 and further modified by this Agreement," and thus not one that was released pursuant to Paragraph 5 for that reason as well. BioChem ineffectually argues in response to the latter point that a claim that first arose in July 1992 could not have arisen under an agreement that was last amended in May 1993. But the 1988 Agreement, as amended, still imposes an obligation on BioChem to pay for goods that it accepts, and the quoted language does not unambiguously refer to BioChem's obligation to pay only for goods purchased after execution of the Settlement Agreement, although it could be read that way. Thus, this provi-

---

R.Civ.P. 56(e) (requiring that "[s]upporting and opposing affidavits ... be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence").

4. BioChem might argue that the foregoing analysis violates the parol evidence rule, in that it considers extrinsic evidence not for the purpose of resolving an ambiguity, but for the purpose of creating one. It is not, however, a violation of the parol evidence rule to consider extrinsic evidence for the limited purpose of determining whether an apparently clear agreement is ambiguous. *E.g., Donoghue v. IBC USA (Publications), Inc.,* 70 F.3d 206, 215 (1st Cir.1995) (stating that "a court may consider parol and extrinsic evidence for the very purpose of deciding whether the documentary expression of the contract is ambiguous."); *Smart v. The Gillette Company Long–Term Disability Plan,* 70 F.3d 173, 179 (1st Cir.1995) (extrinsic evidence offered "to demonstrate that a term is vague or ambiguous in the first place" may occasionally be considered; "courts sometimes may ponder extrinsic evidence to determine whether an apparently clear term is actually uncertain"). In any case, the term "outstanding warranty claims" is sufficiently uncertain in the context of Paragraph 3.5(a) to be ambiguous, even without consideration of extrinsic evidence.

sion, like all the others on which the parties rely, is ambiguous.

Having concluded that the relevant language of the Settlement Agreement is ambiguous, I shall turn to extrinsic evidence to see if it sheds any light on the subject. It does, but not quite enough to say that a reasonable jury, after hearing it, could come to only one conclusion. First and foremost are the discussions that took place at meetings in February and March 1993. Those discussions are consistent with ITL's position that the parties' mutual intent was that, upon ITL's payment in full of all warranty claims that BioChem had actually asserted (which, as of March 1993, totaled approximately £15,000), BioChem would cease withholding the balance that remained outstanding in connection with Purchase Order No. 11726. But the only witness to such meetings, Hugh Edmonds, was apparently not present when the final settlement was negotiated, and he can only rely on hearsay and inference as a basis for concluding that BioChem eventually agreed that, upon payment by ITL of the precise amount of BioChem's outstanding warranty claims, £15,243.39, it would make full payment for goods it had previously purchased. While such inference would be reasonable and permissible, it is not inevitable. After all, if that were the parties' intent, the Settlement Agreement could have said so in far more direct language. Therefore, the question of whether such inference should be drawn is an issue of fact for the jury to resolve.

BioChem also relies on extrinsic evidence. It argues that the only dispute that was outstanding under the 1988 Agreement and the only claim that was the subject of the 1992 lawsuit (C.A. No. 92–12748–K) concerned BioChem's withholding of £85,100.85 from its July 1992 payment. Therefore, BioChem argues, the Settlement Agreement would be illusory and meaningless if it did

not settle such dispute and release such claim. But BioChem is mistaken. There were, in fact, other disputes that were then outstanding, such as ITL's claim for damages for BioChem's purported termination of the 1988 Agreement or, as discussed below, its assertion that the 1991 Warranty Settlement was void for duress. The Settlement Agreement, Paragraph 5 in particular, would have put these claims to rest.[5]

In short, extrinsic evidence, while on balance more helpful to ITL than to BioChem, does not conclusively resolve the ambiguity inherent in the language of the Settlement Agreement with respect to the issue of the parties' intent.

 This leaves for consideration the separate question of the applicability of the doctrine of claim preclusion to ITL's voluntary dismissal with prejudice of the lawsuit it had brought against BioChem in November 1992. Basic principles concerning the doctrine are not in dispute. First, because the 1992 lawsuit was brought in federal court, we must look to federal principles of claim preclusion to determine what preclusive effect its dismissal had. *See e.g., Porn v. National Grange Mutual Insurance Co.,* 93 F.3d 31, 34 (1st Cir.1996) (holding that because the judgment in the prior action was rendered by a federal court, "the preclusive effect of that judgment in the instant diversity action is governed by federal res judicata principles"); *Apparel Art Int'l v. Amertex Enterprises,* 48 F.3d 576, 582–83 (1st Cir.1995) (stating that "[f]ederal law principles of res judicata govern the preclusive effect of a prior federal court's judgment on a subsequent action brought in federal court"). Second, under federal principles of claim preclusion, "a final judgment on the merits of an action precludes the parties from relitigating claims that were raised or could have been raised in that action." *Porn,* 93 F.3d at 34. Third, for

---

5. Another item of extrinsic evidence on which BioChem relies is a letter dated May 12, 1994, from ITL to BioChem, (Ex. 2, Docket No. 55), in which ITL states that "[t]he Settlement Agreement ... includes mutual releases between the parties for all debts, demands etc., except as specifically provided for." BioChem argues that the claim for £85,100.85 was not "specifically provided for," and, therefore, it was not pre-

served. ITL argues at least as persuasively, however, that it was, since the Settlement Agreement expressly reserved all claims arising under the 1988 Agreement. In any event, ITL's obvious attempt in the interest of brevity to paraphrase the terms of the Settlement Agreement nearly a year after it was executed is hardly the type of extrinsic evidence that could definitively resolve the issue of the parties' original intent.

these purposes, a voluntary dismissal with prejudice is the equivalent of a "final judgment on the merits." *E.g., Langton v. Hogan,* 71 F.3d 930, 935 (1st Cir.1995); *Chase Manhattan Bank, N.A. v. Celotex Corp.,* 56 F.3d 343, 345 (2d Cir.1995). Fourth, the parties in the two cases must either be the same, as they are here, or in privity with one another. *See Porn,* 93 F.3d at 34 (requiring "sufficient identity between the parties in the two suits" before a claim can be precluded under federal res judicata principles).

 Applying these principles to the present case, there was clearly a final judgment on the merits of the 1992 lawsuit, and that lawsuit was between the same parties. This leaves only one issue for consideration: is there sufficient identity between the claim asserted in 1992 and the present claim to say that the dismissal of the 1992 lawsuit with prejudice in 1993 bars the claim in this case?

On a superficial level, at least, it appears that, for purposes of applying the doctrine of claim preclusion, there is sufficient identity between the claim ITL now seeks to assert and the one that was the subject of the 1992 lawsuit. Indeed, it appears that the two claims are not just similar in nature and transactionally related, but that they are in fact identical, in that both seek to recover the same £85,100.85 that BioChem withheld from its July 1992 payment.[6]

In this instance, however, appearances may be deceiving. The claim on which ITL brought suit in November 1992 was for £85,100.85, the payment of which was contractually due in July 1992 pursuant to the terms of the 1988 Agreement. The claim which ITL is now asserting is unquestionably for

the same £85,100.85. Arguably, however, by the time the 1992 case was dismissed with prejudice one week after execution of the Settlement Agreement, BioChem's payment obligation had been deferred until May 1994, pursuant to Paragraph 3.6 of the Settlement Agreement. If so, then it would appear that the present claim is not barred by claim preclusion, because it would be a new and different claim than the claim that was dismissed with prejudice in June 1993, and more importantly, it would not have matured until May 1994, one year later. *See, e.g., Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 328, 75 S.Ct. 865, 868, 99 L.Ed. 1122 (1955) (stating that "[w]hile the [earlier] judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist"); *Securities and Exchange Commission v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1464 (2d Cir.1996) (stating that res judicata "will not preclude a subsequent suit for a breach that had not occurred when the first suit was brought"), *cert. denied sub nom. First Jersey Securities, Inc. v. S.E.C.,* —— U.S. ——, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997).

I use the word "arguably" advisedly, since the meaning and effect of Paragraph 3.6 is not absolutely clear. On the one hand, it is possible to read that paragraph as canceling BioChem's obligation under the 1988 Agreement to make immediate payment of the sum due in July 1992 and as replacing it with a new and different payment obligation that did not ripen until May 1994, as part of the final set-off prescribed in the Settlement Agreement. On the other hand, it is also

---

6. Just as BioChem does not concede that it withheld £85,100.85 (or any other amount) from its July 1992 payment, ITL does not concede that this £85,100.85 was the subject of the 1992 lawsuit, but it unquestionably was. The complaint states in Paragraphs 5 and 6 that BioChem "issued its [ ] Purchase Order Agreement Number 11726 ... to purchase ... Goods," and that it "breached its contractual obligations to acquire and to pay for the Goods...." (Complaint, Ex. 7, Docket No. 28.) Conceivably, the £85,100.85 might relate to goods shipped under a different purchase order, but that in fact is not the case. The BioChem Purchase Order referenced in the complaint, No. 11726, corresponds to the invoices which ITL issued in May and June 1992

and from which BioChem withheld £85,100.85 in payments in July 1992, according to ITL's Senior Account Clerk, Carol A. Pattenden. (Pattenden Decl. ¶¶ 3–5, Docket No. 27.) Specifically, Pattenden verifies that the invoices that appear in ITL's Exhibit 5 of Docket No. 28 are the ones from which the £85,100.85 was deducted. (*Id.*) Those invoices clearly state on their face that they were issued in reference to Purchase Order No. 11726. This closes the loop and leads to the inescapable conclusion that the "unauthorized deduction" in the amount of £85,100.85 for which ITL now seeks recovery was taken with reference to Purchase Order No. 11726, which, in turn, was explicitly the subject of the November 1992 complaint.

possible to read Paragraph 3.6 as not at all deferring or otherwise affecting ITL's right to demand and, if necessary, bring suit to recover immediate payment. Rather, Paragraph 3.6 may be read as simply establishing a procedure for the settling of all accounts that for any reason remained outstanding as of April 30, 1994. Under this interpretation, BioChem's original obligation to pay the full amount in July 1992 or upon demand at any time thereafter would have survived and been unaffected by the signing of the Settlement Agreement, only to be extinguished one week later by the dismissal with prejudice of the 1992 lawsuit.

In short, assuming, *arguendo*, that the parties did not intend to wipe out BioChem's payment obligation altogether, it is unclear whether Paragraph 3.6 of the Settlement Agreement was intended to leave in place BioChem's obligation to pay the outstanding balance (£85,100.85) on demand (in which case res judicata would apply) or, instead, to replace such obligation with a new and different one that did not ripen until May 1994 (in which case res judicata would not apply). Pending the jury's resolution of this ambiguity, it is impossible to answer the legal question whether there is "sufficient identity" between the present claim and the one on which suit was previously brought to satisfy this element of the doctrine of claim preclusion.

Because the Settlement Agreement is ambiguous concerning the parties' intent to preserve in any form BioChem's obligation to pay the £85,100.85, and because, even if that were the intent, the question of whether the claim survived the dismissal with prejudice of the 1992 lawsuit turns on whether the jury construes Paragraph 3.6 as preserving an existing obligation that had already ripened or as creating a new one that had not, I recommend that plaintiff's Motion for Partial Summary Judgment Regarding an Unauthorized Deduction (Docket No. 23) be **DENIED.**

B. *Cross Motion for Partial Summary Judgment of the Defendant BioChem*

This is the mirror image of the motion just considered. Because the Settlement Agreement is ambiguous with respect to the parties' intent both to preserve the claim for £85,100.85 and to create a new, future payment obligation to replace the one on which the 1992 complaint was based, I recommend that this motion (Docket No. 33) also be **DENIED.**

C. *Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims*

As noted, ITL seeks judgment on BioChem's counterclaim for the balance of the warranty allowance remaining under the 1991 Warranty Settlement (said by BioChem to be approximately £465,000) and on two other BioChem counterclaims: for misappropriation of trade secrets and for the payment by ITL of approximately £64,000 for the repurchase of obsolete parts. We can quickly dispose of the latter two. BioChem conceded at the hearing on these motions that it is not pressing its claim for ITL's alleged misappropriation of trade secrets. I recommend, therefore, that ITL's motion (Docket No. 44) be **ALLOWED** to that extent. I also recommend, for four independent reasons, that ITL's motion (Docket No. 44) be **ALLOWED** as to BioChem's counterclaim regarding ITL's purchase of obsolete parts. First, BioChem does not in its opposition papers respond to this aspect of ITL's motion.[7] Second, there is no admissible evidence that ITL ever agreed to purchase BioChem's obsolete parts.[8] Third, assuming

7. The closest BioChem comes to responding is an offer to drop this claim in exchange for ITL's agreement to drop its claim for £85,100.85. (The Defendant BioChem ImmunoSystems (U.S.) Inc.'s Memorandum in Opposition to Wilj's Motion for Summary Judgment on Defendant's Counterclaims and in Support of Its Cross–Motion for Partial Summary Judgment as to Counterclaim I at 3 n. 3, Docket No. 56.) This is a *non sequitur.* Not only is there no apparent relationship between the two claims, but, even if there were, that would not excuse BioChem's failure to present evidence showing that ITL ever undertook to purchase obsolete parts from BioChem.

8. The only "evidence" of such agreement is an invoice from BioChem to ITL that sheds no light on the subject. The invoice contains on its face a cryptic reference to a memorandum dated May

such agreement was ever made, it was not part of the 1988 Agreement or the 1991 Warranty Settlement and, therefore, was unambiguously extinguished as a result of the Settlement Agreement, which it would have predated by approximately two years. Finally, BioChem now concedes that it does not know the whereabouts of the obsolete parts that supposedly are the subject of this agreement. (Letter from Beth O'Neill Maloney to the Court dated 6/13/97, Docket No. 100.) ITL should not be required to repurchase obsolete parts from BioChem that BioChem is unable to deliver.

▆ This leaves only one issue for consideration—BioChem's counterclaim for payment of approximately £465,000 that it says is still outstanding pursuant to the 1991 Warranty Settlement. It will be recalled that, under that agreement, ITL agreed to give BioChem warranty credit in the amount of approximately £780,000, to be reduced, first, through a discount of £584 on each SR–1 instrument purchased thereafter by Bio-Chem. If that did not deplete the credit by a certain date, then the credit would be given through the waiver of royalty payments that BioChem would otherwise owe. Finally, if that still left a balance outstanding by December 31, 1993, the parties were to agree upon "a means to settle this within 120 days." (Warranty Settlement, Ex. 6, Docket No. 47.) BioChem maintains that the "means to settle" was fixed in the Settlement Agreement, and consisted of ITL's agreement that, as of April 30, 1994, the parties would set-off all outstanding amounts between them (including whatever remained owing under the 1991 Warranty Settlement) and the party that owed money to the other would pay the balance within thirty days. ITL makes essentially three responses: (1) that the Settlement Agreement is not indisputably the "means to settle" that the parties agreed in the 1991 Warranty Settlement that they would establish, if necessary; (2) that the Settlement Agreement settled all outstanding warranty claims for £15,243.39, including the balance outstanding under the 1991 Warranty Settlement; and (3) that the 1991 Warran-

ty Settlement is void for duress. None has merit.

First, although it seems clear that the Settlement Agreement was indeed intended to constitute the "means to settle" any outstanding balance under the 1991 Warranty Settlement, it is, in the final analysis, immaterial whether the parties (or either of them) made a conscious connection between the Settlement Agreement and the "means to settle" language in the 1991 Warranty Settlement. The Settlement Agreement clearly and unambiguously provides, in Paragraph 3.6, that on April 30, 1994, the parties "will set-off any outstanding amounts between them arising from this Agreement, the [new] Purchase Orders ..., the [1991] Warranty Settlement and the 1988 Agreement as amended and any resulting balance shall be paid by the Party owing it within thirty (30) days." This new, freestanding obligation to pay the net balance owing in favor of either party is unambiguous and enforceable in accordance with its terms, whether or not it was intended to be the "means to settle" referred to in the 1991 Warranty Settlement.

Second, notwithstanding the ambiguity in the Settlement Agreement about whether the parties intended to extinguish BioChem's obligation to pay ITL the £85,100 .85 it had withheld in July 1992, it is clear that the parties did not intend to extinguish ITL's obligations under the 1991 Warranty Settlement. Those obligations were expressly preserved in at least three places. First, and sufficient unto itself, Paragraph 3.5(b) provides that "[t]he parties confirm the continued existence of the ... 1991 Warranty Settlement and the rights and obligations arising therefrom;" second, Paragraph 3.6, as noted, expressly includes "outstanding amounts ... arising from ... the [1991] Warranty Settlement" in the amounts to be set-off and paid by the end of May 1994; and, third, Paragraph 5 expressly carves out "disputes arising under the [1991] Warranty Settlement" from the parties' mutual release. In the face of all this, ITL points only to

10, 1991, from ITL to BioChem, which memorandum does not appear to be part of the summary judgment record. (See Plaintiff's Memo-

randum in Support of Its Motion for Summary Judgment on Defendant's Counterclaims at 11, Docket No. 45.)

Paragraph 3.5(a) of the Settlement Agreement in a feeble effort to show that the parties intended to extinguish BioChem's rights under the 1991 Warranty Settlement. The specific language in that paragraph upon which ITL relies is the statement that the payment of £15,243.39 by ITL shall settle "any and all outstanding warranty claims." According to ITL, "outstanding warranty claims" includes amounts that were otherwise still owing under the 1991 Warranty Settlement. But clearly the "warranty claims" that were the subject of the 1991 Warranty Settlement were no longer "outstanding" as of May 1993, since they had been resolved two years earlier by ITL's agreement to give BioChem a warranty credit in the amount of £779,964. The only warranty claims that were outstanding as of May 1993 were the approximately £15,000 in such claims that BioChem had documented during and after the March 1993 meeting, and, arguably, the £85,100.85 that BioChem withheld in July 1992 (i.e., one year *after* the 1991 Warranty Settlement). As Paragraph 3.5(b) makes unmistakably clear, the phrase "outstanding warranty claims" does not include the parties' respective "rights and obligations" under the 1991 Warranty Settlement.

Finally, there is no merit to ITL's argument that the 1991 Warranty Settlement is void for duress. To the extent such argument might ever have had any force, ITL waived it no later than May 26, 1993, when it expressly ratified the 1991 Warranty Settlement in Paragraph 3.5(b) of the Settlement Agreement ("confirm[ing] the continued existence of the . . . 1991 Warranty Settlement and the rights and obligations arising there-

from") and released BioChem pursuant to Paragraph 5 of the Settlement Agreement from any claims related to "prior dealings." *Deren v. Digital Equipment Corp.*, 61 F.3d 1, 2–3 (1st Cir.1995); *In re Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st Cir.1989) (stating that a party "may ratify an agreement entered into under duress . . . 'first, by intentionally accepting benefits under the contract; second, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it; and third, by recognizing its validity . . . by acting upon it, performing under it, or affirmatively acknowledging it' "). Indeed, ITL probably waived its duress argument even before May 1993, since, as of that time, it had been doing business with BioChem under the 1991 Warranty Settlement for more than two years without objection. *Id.*[9]

To summarize, I recommend for the foregoing reasons that plaintiff's Motion for Summary Judgment on Defendant's Counterclaims (Docket No. 44) be **DENIED,** to the extent BioChem's counterclaim seeks recovery of the balance outstanding under the 1991 Warranty Settlement, and **ALLOWED,** to the extent BioChem's counterclaim seeks recovery for ITL's misappropriation of trade secrets and failure to purchase obsolete parts.

### D. *BioChem's Motion for Partial Summary Judgment*

This is a motion by BioChem for summary judgment on ITL's claim under Mass.Gen.Laws ch. 93A, on the ground that the unfair and deceptive practices com-

---

9. On July 29, 1997, ITL filed a motion (Docket No. 104) seeking leave to file a surreply brief (Docket No. 102) in which it argued that the Settlement Agreement could not constitute a ratification of the 1991 Warranty Settlement because the Settlement Agreement was itself the product of continuing duress by BioChem. I have denied the motion for leave to file on the ground that it is too late to introduce new issues into this already complex case. Even if leave to file the surreply were granted, however, it would not change the outcome, since it is frivolous for ITL to argue for the first time, more than four years after it signed and obtained the benefits of the Settlement Agreement, that such agreement was induced by duress. Indeed, the frivolousness of

ITL's argument becomes even more apparent when it is recalled that it brought this lawsuit in Massachusetts in express reliance on the consent to jurisdiction in the Settlement Agreement and that it did so for the stated purpose of enforcing its rights under that agreement. (*See* Complaint at 1, line 1, Ex. 1, Docket No. 47 ("Plaintiff seeks damages resulting from the defendant's breach of a settlement agreement. . . ."); *id.* at 4, ¶ 17 ("The parties' rights and obligations under the Agreement are, by its terms, governed by Massachusetts law, and the Agreement provides that any controversy arising therefrom 'shall be determined by the U.S. District Court for the District of Massachusetts . . . to whose jurisdiction the Parties submit themselves.' ").)

plained of by ITL did not occur primarily and substantially in Massachusetts.[10]

ITL concedes that the conduct about which it complains did not occur primarily and substantially in Massachusetts. (Transcript of Hrg. on 6/03/97 at 59, lines 4–5, 23–25, Docket No. 108). It argues, however, that this does not defeat its claim, because the parties, in the Settlement Agreement, consented to personal jurisdiction in Massachusetts and to the applicability of Massachusetts law. (*Id.* at 61–62.) This argument misses the point. Massachusetts law, which the parties agreed would apply to their dispute, by *its terms* says that "no action shall be brought or maintained" under Mass.Gen.Laws ch. 93A, § 11, if the underlying conduct did not occur primarily and substantially in Massachusetts. Therefore, dismissal of this claim, which involves conduct that admittedly has no relationship whatsoever to Massachusetts, is entirely in accordance with both the letter of Massachusetts law and the choice of law clause of the Settlement Agreement. *See Roche v. The Royal Bank of Canada,* 109 F.3d 820, 826 n. 7 (1st Cir.1997) ("The choice of law test and the 'primarily and substantially' test, though similar in many respects, are not identical. That a judge should reach opposite results in applying these two tests in a single case is no sign of error.").

I therefore recommend that BioChem's Motion for Partial Summary Judgment (Docket No. 48) be **ALLOWED**.

### E. *BioChem's Cross–Motion for Partial Summary Judgment as to Counterclaim I*

This is to some extent the mirror image of ITL's motion for summary judgment on BioChem's counterclaims (Docket No. 44) discussed above, since BioChem here seeks summary judgment on its right to payment of £464,604, representing the balance outstanding under the 1991 Warranty Settlement. For reasons already stated, the Set-

tlement Agreement unambiguously entitles BioChem to set-off the outstanding balance of the warranty credit under the 1991 Warranty Settlement against other amounts that the parties owe to each other. The precise amount of that balance is genuinely disputed, however, at least to the extent BioChem has not purported to take into account any royalty payments that it was permitted to forego. (Plaintiff's Opposition to Defendant's Cross–Motion for Summary Judgment Regarding Warranty Claims Asserted in Counterclaim I at 9–10, Docket No. 74.) Furthermore, pending implementation of the set-off procedure contemplated by the Settlement Agreement, it cannot be determined which party is indebted to which, and in what amount. Therefore, I recommend that BioChem's cross motion for partial summary judgment (Docket No. 55) be **ALLOWED**, but only to the extent that it shall be deemed established for the purpose of further proceedings in this case that BioChem may include the balance of the warranty credit under the 1991 Warranty Settlement, in such amount as is determined by the jury to be outstanding, as an item to be set-off pursuant to Paragraph 3.6 of the Settlement Agreement. *See* Fed. R.Civ.P. 56(d).

## V. *CONCLUSION AND RECOMMENDATION*

For all the foregoing reasons, I recommend that:

1. Plaintiff's Motion for Partial Summary Judgment Regarding an Unauthorized Deduction (Docket No. 23) be **DENIED;**

2. Cross Motion for Partial Summary Judgment of the Defendant BioChem (Docket No. 33) be **DENIED;**

3. Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims (Docket No. 44) be **DENIED,** to the extent BioChem's counterclaim seeks recovery of the balance outstanding under the 1991 Warranty Settlement, and **ALLOWED,** to the extent

---

10. Mass.Gen.Laws ch. 93A, § 11 (West 1997), provides, in pertinent part:

No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.

BioChem's counterclaim seeks recovery for ITL's misappropriation of trade secrets and failure to purchase obsolete parts;

4. BioChem's Motion for Partial Summary Judgment (Docket No. 48) be **ALLOWED;** and

5. BioChem's Cross–Motion for Partial Summary Judgment as to Counterclaim I (Docket No. 55) be **ALLOWED,** but only to the extent that it shall be deemed established for the purpose of further proceedings in this case that BioChem may include the balance of the warranty credit under the 1991 Warranty Settlement, in such amount as is determined by the jury to be outstanding, as an item to be set-off pursuant to Paragraph 3.6 of the Settlement Agreement.

## VI. *IMPORTANT NOTICE OF RIGHT TO OBJECT AND WAIVER OF RIGHT TO APPEAL FOR FAILURE TO DO SO WITHIN TEN DAYS*

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court **WITHIN 10 DAYS** of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court's order entered pursuant to this Report and Recommendation. *See United States v. Valencia–Copete,* 792 F.2d 4, 5–6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 605 (1st Cir.1980); *see also Thomas v. Arn,* 474 U.S. 140, 148–149, 106 S.Ct. 466, 471–472, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986).