Mary WARD, Plaintiff–Appellant,

v.

FIRST FEDERAL SAVINGS BANK, n/k/a Pinnacle Bank, Defendant–Appellee.

No. 98–2648.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 7, 1999.

Decided April 15, 1999.

Monica S. Morris (argued), Meyer, Lyles & Godshalk, Gary, IN, for Plaintiff–Appellant.

James S. Whitehead, Ann K. Shuman (argued), Sidley & Austin, Chicago, IL, for Defendant–Appellee.

Before FLAUM, EASTERBROOK, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

First Federal Savings Bank[1] fired Mary Ward for persistent violations of bank policy and security protocols at the branch that Ward managed. Ward, who is African–American, contends that the bank subjected her to racial harassment, that the decision to terminate her was racially discriminatory and, alternatively, that it amounted to retaliation for a charge she had filed with the Equal Employment Opportunity Commission alleging harassment.[2] The district court granted sum-

---

**1.** First Federal is now known as Pinnacle Bank. For the sake of convenience, we shall refer to it either as "First Federal" or the "bank".

**2.** In the district court, Ward also pressed a claim of wage discrimination. Ward does not challenge the court's decision to enter sum-

mary judgment in favor of the bank. We affirm.

## I.[3]

First Federal hired Ward as an assistant branch manager late in 1986. She was initially assigned both to the bank's main facility in Gary, Indiana and its Brunswick branch, and subsequently she was reassigned to First Federal's TriCity branch in Gary. In January 1990, Ward assumed full responsibility for oversight of operations and business development at the TriCity branch, and in November of that year she was formally promoted to the position of branch manager and banking officer. In that capacity, Ward supervised all of the seventy-eight persons employed at the branch and was ultimately accountable for their performance. She had final decision-making authority in the hiring of new tellers, was responsible for their training and evaluation, and ensured that they performed their jobs correctly.

On February 4, 1993, Sheldon Cutler, First Federal's vice president of operations and cashier, wrote a memorandum to Robert Malkowski, the bank's vice president for branch administration, and Joseph Bartolome, the chief financial officer, citing recurrent cash management problems at the TriCity branch. Cutler reported that on multiple occasions, the branch was discovered to have had as much as $500,000 in excess cash on hand. In some instances, the branch would hold on to such amounts of cash over a weekend or even up to four or five days, depriving the bank of investment opportunities and creating security concerns. Cutler also noted that although bank policy required incoming shipments of cash from the Federal Reserve to be counted within twenty-four hours, large shipments of cash to the TriCity branch had occasionally been left un-

counted for several days. Because the Federal Reserve disclaims responsibility for any shortfalls not reported within three days of shipment, the failure to confirm the amount promptly after the shipment is received exposes First Federal to liability for any shortfall discovered later. Cutler added that the delay in counting the money and entering it into the bank system might also permit theft by bank employees to go unnoticed. Ward Dep. Ex. 16.

There were additional problems as well. On March 5, 1993, Cutler expressed concern to Malkowski about the frequency, dollar amount, and number of teller overages and shortages at the TriCity branch. Thirty-four incidents of this nature had occurred in January and February 1993. Ward Dep. Ex. 17. Malkowski discussed this issue with Ward in March, and followed up on the conversation with a memorandum to Ward noting that "your tellers' record of offages is unacceptable...." Ward Dep. Ex. 19. "Both you and your Head Teller," Malkowski admonished, "must constantly supervise and train your staff in order to insure compliance with policies and to minimize errors." *Id.*

Although Ward's annual reviews had rated her performance in branch operations "good" in 1991 (Ward Dep. Ex. 14) and "very good" in 1992 (Ward Dep. Ex. 15), her performance in that regard was deemed only "fair" in the fall of 1993 (Ward Dep. Ex. 20). Malkowski noted in that 1993 review that the TriCity branch was experiencing "severe staffing and personnel-related problems." *Id.* Ward would later testify in her deposition that she found nothing unfair or inaccurate in this appraisal. Ward Dep. 114.

The problems Cutler and Malkowski noted in 1993 persisted into 1994, both at the TriCity branch as well as the four-person Miller branch in Gary for which

mary judgment against her on this claim. We therefore need not address it.

**3.** We have derived the following facts largely from the statement of undisputed facts that

First Federal filed below. Ward did not effectively contest the accuracy of that statement. *See* R. 26 at 3–4.

Ward was also given oversight responsibility in 1993. Between May 27 and June 13, 1994, Cutler wrote a series of memoranda documenting a total of fifty errors by eight tellers working under Ward's supervision at these two branches. Ward Dep. Ex. 29. An additional error that had occurred early in May resulted in a $5,000 loss to the bank. A July 21, 1994 memorandum noted that a TriCity teller had, in that instance, issued a cash advance on a VISA charge card without following standard banking practices. Ward Dep. Ex. 33; *see also* Ward Dep. Exs. 30, 41. Cutler identified two additional errors by TriCity tellers on July 21, 1994. Ward Dep. Exs. 34, 35.

Cutler met with other senior bank officials on July 25, 1994, to address the problems he had identified at the TriCity and Miller branches. Bank president Frank Pavlic suggested that Ward be relieved of responsibility for the Miller branch so that she could focus her attention and efforts upon the TriCity branch alone. Cutler and CFO Bartolome concurred.

On the following day, July 26, Cutler and Judith Zlatic, assistant vice-president for personnel, met with Ward and presented her with a notice concerning her performance as manager of the TriCity and Miller branches.

> This is a written warning to you regarding your performance as manager of the TriCity and Miller branches. The recent loss of $5,000 on a VISA advance is a critical incident which cannot be ignored. It is the latest example of a pervasive problem which needs to be addressed immediately.

> The quality of branch operations at TriCity is well below expectations. Of all the branches, TriCity has the highest number of teller errors, including teller differences and file maintenance errors. The problem persists even after remedial steps were outlined for you in writing in March, 1993.

> Inappropriate cash-in-office levels remain a problem, even after repeated counseling by Sheldon Cutler.

TriCity continues to have the highest turnover rate of all the branches, as well as the most losses.

> This situation cannot continue, Mary. Effective Wednesday, July 27, 1994, you will no longer manage the Miller office. All of your effort must be directed to TriCity to ensure that there is a turnaround and that branch operations there meet expected standards. Teller errors must be dramatically reduced; cash ordering and cash-in-office levels must be consistently appropriate; and you must do all in your power to stabilize your staff.

> It is of prime importance that you do this, Mary: your future with First Federal depends upon reaching these goals. It is your responsibility to provide effective control over the functions of the branch office. If you fail to do so, and the current situation continues, you subject yourself to immediate termination.

Ward Dep. Ex. 39; *see also* Ward Dep. 41.

On July 28, the bank's operations officer, Diane Apostoloff, audited the Miller branch at Cutler's behest. In an August 1 memorandum setting forth her findings, Apostoloff noted several problems related to cash-handling and security:

1. The vault was in poor condition. There was no organization and everything was just thrown all over. The vault needs to be straightened and organized.

2. Loose coin was in the coin machine, in coffee cans and paper shopping bags. The coin was not added up. There were little pieces of paper in each container with the totals.

\* \* \*

3. The bulk of the head window currency kept in the vault was not locked up. There was $79,000.00 in a small vault with the door wide open. . . .

4. There were three (3) boxes of rolled coin on the floor in front of a file

cabinet. Once again, not locked up....

5. Romelle [Walton, a branch employee] was not able to locate bait money lists....

Ward Dep. Ex. 42.[4]

Cutler and Zlatic met with Ward again on July 29. At that time, they presented her with a memorandum (penned by Zlatic) which, in addition to summarizing the July 26 meeting, discussed the results of Apostoloff's audit of the Miller branch. Ward Dep. Ex. 41. Noting that Ward was present at that branch and still in charge as late as July 25, the memorandum stated that Ward "should not have tolerated [the] situation" that Apostoloff had discovered. *Id.* The memorandum concluded with another warning to Ward:

Mary, the written warning given to you earlier this week details serious problems and deficiencies with the operation of your branch. During the next 90 days, you will need to demonstrate that you have taken effective control of the branch functions at TriCity. A directive was given to all branch managers earlier this year, and I want to remind you of it now: you must be the first person at the branch each morning to open your office, and you must also be there to close the branch each night. It is absolutely mandatory that you do so. Sheldon Cutler has offered to assist you with any operations problems you have. He has the expertise, and you are encourage[d] to take advantage of it. After 90 days, your progress toward this goal will be assessed, and a decision regarding your continued employment will be made.

*Id.*

In August 1994, while Ward was on sick leave from the bank, she filed a charge of race discrimination with the EEOC. In that charge, she complained that she had been the subject of "continuous harass-

ment" since February 1, 1994. Ward Dep. Ex. 49. Among other instances of the alleged harassment, she noted that the Miller branch had been removed from her supervision on July 27 and assigned to a white co-worker. *Id.*

At the end of August 1994, First Federal hired Mark Angel as the new vice president of branch administration to replace Malkowski, who had resigned seven months earlier. Angel met with Ward and discussed his expectations of her as branch manager on September 14. In a follow-up memorandum to Zlatic, Angel wrote:

I did indicate to [Ward] that I was aware, that she was beginning a probationary period pursuant to Sheldon Cutler's written warning to her on July 29, 1994, which began upon her return from sick leave on September 12, 1994. That I would give her what ever support she needed with reference to training issues, having meetings with her staff or spending time as needed at her branch to help her become successful, but ultimately it was up to her to develop the team atmosphere needed to reduce operational errors, policy and security violations that led to the written warning.

Ward Dep. Ex. 53.

When Cutler visited the TriCity branch on September 23, 1994, he discovered what the bank regarded as a "severe" breach of security. *See* Ward Dep. Ex. 54. The security guard who should have been watching over the branch was instead at a local restaurant down the street, waiting in line to pick up lunch for some of the branch staff. *Id.* Cutler subsequently wrote a memorandum to Ward reminding her that it was her responsibility to make sure that the guard was doing his job. *Id.* In a memorandum of her own to Angel, Ward characterized Cutler's memorandum as another example of continued harass-

---

**4.** On August 1, 1994, Cutler conducted his own follow-up inspection of the Miller branch. He discovered that the accumulation of coins in bags and coffee cans that Aposto-

loff had noted two days earlier was not an anomaly, but a habit of the head teller that Ward (in at least one instance) had known about and tolerated. Ward Dep. Ex. 43.

ment, although she admitted that the guard's absence constituted "a severe violation of bank security and procedures." Ward Dep. Ex. 55. Ward explained that during this incident, she had been in the break room having lunch, and was thus unaware that the guard had left the premises. *Id.* In his reply to Ward's memorandum, Angel rejected the notion that Cutler's report of the security breach constituted harassment, noting that as the bank's security officer, Cutler had done no more than he would have on any other occasion on which he observed a security breach. Ward Dep. Ex. 56. Angel admonished Ward that "[u]ltimately, it is the responsibility of each branch manager and their [*sic*] staff to make sure that the integrity of the security for the branch is maintained and if it is not it will be handle[d] by me accordingly based on the severity of the violation." *Id.*

The final straw was broken when Cutler and Apostoloff conducted a spot audit at TriCity on November 29, 1994. Cutler's subsequent written report describes what they found:

> There were two (2) severe policy violations that could most definitely lead to a bank loss. In the main vault, there was $120,000 in 20's that was received by the branch on Monday, November 21, 1994. As of today's date, Tuesday, November 29, 1994, the money from the shipment has not been verified, broken down, and re-strapped according to bank policy. Due to the time delay, if there is a difference in the shipment, it is a direct loss to our bank.

> \* \* \*

> The second problem is that the Head Teller window had over $50,000 in cash at the time I verified the window. Head window should never have over $5,000 in case of robbery and/or to prevent employee theft. This money should have been sold over to the main vault.
> Mary Hampton, Head Teller at Tri–City, claims that the Branch Manager,

Mary Ward, was aware of the situation. However, Mrs. Ward claims that she was not. Ultimately, it is the Branch Manager's responsibility to ensure that the branch is following procedures.

> Head Teller, Mary Hampton, claimed that they did not have time to break the money shipment down and count it. Once again, we are talking about a delay of eight (8) days. When I arrived at the branch, there were four (4) tellers sitting in the break room that could have been counting this cash.

> \* \* \*

Ward Dep. Ex. 62. Ward later admitted in her deposition that the branch had received a shipment of currency from the Federal Reserve on or about November 21, and that at least two bundles of bills from that shipment had not yet been verified, broken down, and re-strapped as of November 29, when the audit took place. Ward Dep. 278. She admitted that this was a violation of bank policy. *Id.*

Cutler reported the results of the audit to Angel immediately. In view of the continuing problems at TriCity, they recommended to the president and CFO of the bank that Ward be terminated. Pavlic and Bartolome concurred in the recommendation, and Ward was discharged on November 29. Ward later filed a second charge with the EEOC challenging her discharge. Ward Dep. Ex. 65. After receiving her right-to-sue letter, Ward filed this action. Her complaint alleged, inter alia, that she was harassed and ultimately discharged on the basis of her race and that she was also discharged in retaliation for her first EEOC charge.

The district court granted summary judgment in favor of First Federal. After striking much of the affidavit that Ward had obtained from Robert Malkowski, the former assistant vice president of branch administration, the court concluded that Ward had no evidence that she was harassed or discharged because of her race.

Order at 6–10. Similarly, with respect to the retaliatory discharge claim, the court found that Ward had not called into question the legitimate, nondiscriminatory reasons that the bank had articulated for her termination. *Id.* at 14–15.

## II.

Our review of the district court's summary judgment ruling is, of course, de novo. *E.g., Biolchini v. General Elec. Co.,* 167 F.3d 1151, 1153 (7th Cir.1999). Ward is entitled to a favorable construction of the facts as well as the benefit of every reasonable inference that may be drawn from those fact in her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). But First Federal is entitled to summary judgment so long as there is no dispute as to any material fact on which Ward bears the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The district court concluded that there was not. However, Ward contends that the court improperly overlooked evidence that purportedly calls into question the bank's explanations for the actions underlying her claim of harassment (removing the Miller branch from her supervision, for example) as well as the decision to discharge her.

Ward does not dispute that multiple breaches of bank protocol and other problems exposing the bank to potential loss occurred during her tenure as a branch manager. The bank put forth considerable evidence documenting such incidents, and at her deposition Ward repeatedly conceded that she had no contrary evidence. *See, e.g.,* Ward Dep. 171–72, 179–80, 188–89, 190–91, 199, 203–04, 205, 274, 278–79. Ward's hopes of avoiding summary judgment are instead pinned to the affidavit of Robert Malkowski, the former vice president of branch administration. Ward contends that in two respects, Mal-

kowski's affidavit raises a fact question as to whether the bank's treatment of her was discriminatory, notwithstanding the mishaps that admittedly occurred under her supervision.

Malkowski stated in his affidavit that "[he] was aware of instructions issued by the President and CEO of the bank, Frank Pavlic, that he did not want any African Americans working at any of the branches outside of the Gary area, ... because the sight of African Americans at said branches may upset the customers." Malkowski Aff. ¶ 5. In deference to that wish, Malkowski asserted, "no African Americans were considered for hire at those branches and no current [African–American] employees were to be transferred to those offices." *Id.* Ward, of course, worked within rather than without the Gary area, but she points to this averment as direct evidence that Pavlic was inclined to make employment decisions (including the decision to discharge her) on racial grounds. Direct evidence that the challenged employment decision was motivated in whole or in part by a statutorily proscribed criterion like race requires the employer to show that it would have taken the same action even if the illegal criterion had played no role in the decision, and as a practical matter, makes it more difficult for the employer to have the case resolved on summary judgment. *See, e.g., Frobose v. American Sav. & Loan Ass'n of Danville,* 152 F.3d 602, 617 (7th Cir.1998); *Venters v. City of Delphi,* 123 F.3d 956, 973 (7th Cir.1997). Whether or not Pavlic's purported instruction not to hire African Americans for employment outside of Gary would constitute direct evidence that race played a role in the bank's decisions concerning Ward is a question we need not resolve, for we agree with the district court, which struck this paragraph of Ward's affidavit, that the averment lacks the requisite foundation.

Rule 602 of the Federal Rules of Evidence provides that "[a] witness may not testify to a matter unless evidence [which

may include the witness' own testimony] is introduced sufficient to support a finding that the witness has personal knowledge of the matter." The Malkowski affidavit merely asserts that he is "aware" of the alleged instruction by Pavlic; it does not reveal the source of Malkowski's awareness—be it a written directive from Pavlic, a conversation with him, or merely water-cooler gossip. As such, the affidavit fails to establish that Malkowski has personal knowledge on the subject of Pavlic's purported instruction. FED.R.CIV.P. 56(e); *see Adusumilli v. City of Chicago*, 164 F.3d 353, 359 (7th Cir.1998); *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998), petition for cert. filed (Mar. 29, 1999) (No. 98–1551); *Wilj Int'l Ltd. v. Biochem Immunosys., Inc.*, 4 F.Supp.2d 1, 9 n. 3 (D.Mass.1998); *Mick v. Brewer*, 923 F.Supp. 181, 184 (D.Kan.1996). The district court was right to disregard it.

Malkowski made several other assertions which Ward holds up as proof that the performance-related reasons given for her discipline and discharge are pretextual. But as we are about to explain, none of these assertions is of much help to Ward's case.

■ For example, Malkowski attributed the teller error rate at the TriCity branch, which had a large number of customers and transactions, to a high turnover rate among the tellers and the lag time in recruiting, training, and placing new tellers. Malkowski Aff. ¶¶ 3, 4. This type of allegation may suggest that the bank unfairly held Ward to account for problems that were beyond her control, but it does not suggest that the bank's reasons for criticizing her performance and then discharging her were pretextual. *See, e.g., Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410–11 (7th Cir. 1997).

More pertinent in that regard is Malkowski's recollection that a white branch manager who had worked under his supervision "performed most of his functions for years below expectations and goals" but was not terminated, and that the white supervisors of employees who were discovered to have stolen and/or embezzled funds (and terminated for it) were likewise not fired. Malkowski Aff. ¶¶ 7–9. The district court found such averments "inadmissible" because they lacked sufficient detail. Order at 3–4. "Inadmissible" may not be the right label for such evidence, as there was nothing in the form or content of Malkowski's averments which rendered them improper.

■ Ultimately these averments do not help Ward establish pretext, however. That another manager, not African–American, was kept on despite performing below expectations does not alone cast doubt on the rationale for Ward's termination, because the other manager's shortcomings may have been in areas of less immediate concern to the bank than the problems that occurred under Ward's supervision. The fact that other supervisors were not fired when their subordinates engaged in criminal activity is similarly unenlightening, as Malkowski's affidavit does not reveal to what extent those supervisors may have been responsible for the crimes. The bank says that it fired Ward because she did not correct the recurrent security lapses and failure to observe bank protocol about which she had been warned repeatedly. Nothing in Malkowski's affidavit reveals that similarly situated managers were treated more favorably than Ward was.[5]

Malkowski's affidavit is therefore devoid of any direct evidence that racial considerations played a role in either the bank's decision to discharge Ward or in the actions preceding termination that Ward has

---

5. Malkowski's affidavit also asserted that "there was no legitimate business reason for terminating Ms. Ward." Malkowski Aff. ¶ 10. The district court struck this conclusory assertion, and rightly so. Malkowski had left the bank nine months prior to Ward's discharge, was obviously not a party to the series of inspections, reports, discussions, and warnings which occurred in the interim between his departure and Ward's termination, and so was not privy to the information and events that culminated in her discharge.

alleged were harassing. Nor does that affidavit suggest that the performance-related reasons the bank cited for its actions were pretextual. Ward cites nothing beyond Malkowski's affidavit that might help her in either respect. The decision to enter summary judgment on Ward's claims of racial harassment and race-based discharge was therefore correct.

Summary judgment was also appropriate as to the claim of retaliatory discharge. Again Ward has relied solely on the Malkowski affidavit to call into question the bank's motives. However, other than Malkowski's bald proclamation that "there was no legitimate business reason for terminating Ms. Ward" (which the district court was quite right to disregard, see n. 5, *supra*), there is nothing in the affidavit suggesting that the EEOC charge tainted the bank's decision to fire her. Nor, as we have already noted, is there anything suggesting that the bank's stated rationale for the decision was pretextual.

### III.

The district court's grant of summary judgment in favor of First Federal is AF-FIRMED.